***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Donovan and enters the following Opinion and Award:
 *********** EVIDENTIARY MATTERS *Page 2 
Plaintiff filed a "Motion to Compel Payment of Medical Treatment" in this matter on September 22, 2011. Defendant responded to plaintiff's motion on October 3, 2011, and objected to the same. The Full Commission addresses plaintiff's motion in this Opinion and Award and ALLOWS the same.
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. On May 22, 2004, the date of the admittedly compensable injury by accident giving rise hereto, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act when plaintiff attempted to put trash in the outside compactor and slipped and fell injuring his bilateral shoulders. The Industrial Commission has jurisdiction over the parties and the subject matter.
2. On said occasion, the employee-employer relationship existed between plaintiff and defendant-employer with the employer being self-insured.
3. Defendant timely acknowledged the compensability of plaintiff's bilateral shoulder injuries and initiated medical and indemnity compensation at the rate of $365.40 per week.
 ***********
The following were submitted to the Deputy Commissioner as:
 EXHIBITS
1. The parties stipulated the following documentary evidence:
 a. Stipulated Exhibit #1: Medical records
 b. Stipulated Exhibit #2: I.C. Forms *Page 3 
2. In addition to Stipulated Exhibit(s), the following Exhibit was admitted into evidence:
 a. Plaintiff's Exhibit #1: Plaintiff's employment records (submitted post-hearing and admitted into evidence without objection)
 ***********
As set forth in the Pre-Trial Agreement and Deputy Commissioner Donovan's May 25, 2011 Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. Whether plaintiff is entitled to additional workers' compensation benefits as a result of his admittedly compensable bilateral shoulder injuries, including but not limited to, indemnity benefits and ongoing medical care?
2. Whether plaintiff's admittedly compensable injury by accident caused his bilateral hip condition?
 ***********
Based upon the preponderance of the evidence from the entire record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 51 years old. Plaintiff began his employment with defendant as a meat cutter in October 2003. On May 22, 2004, plaintiff suffered an admittedly compensable injury by accident when he stepped in cake dough on the ground, which caused his feet to go forward and out from under him. Plaintiff fell backwards onto the floor and was rendered unconscious. Plaintiff does not remember anything else about the fall. *Page 4 
2. Plaintiff presented to Spruce Pine Community Hospital on May 22, 2004, with complaints of left shoulder pain. Plaintiff was diagnosed with shoulder sprains and discharged.
3. On June 1, 2004, plaintiff was examined by Dr. Christopher Elder of Asheville Orthopedic Associates. Plaintiff reported a fall which resulted in his landing on his left shoulder. Plaintiff was found to have a full thickness tear of the supraspinatus and subscapularis tendon with a 12 mm defect in his left shoulder for which he underwent a surgical correction on June 28, 2004, performed by Dr. Elder. Plaintiff remained out of work following this surgery.
4. Due to continuing complaints of pain in his right shoulder, plaintiff underwent an MRI scan which revealed a rotator cuff tear of 5 mm with impingement syndrome. He subsequently underwent a right shoulder surgery on October 25, 2004, again performed by Dr. Elder. Plaintiff was again out of work until December 4, 2004.
5. Plaintiff returned to work for defendant performing various light duty positions, including working in the produce department and stocking shelves. While working on these light duties, he developed hip pain when kneeling down to stock shelves. Plaintiff also continued to experience pain in both shoulders and received ongoing treatment from Dr. Elder. On September 20, 2005, Dr. Elder diagnosed plaintiff with recurrent bilateral rotator cuff tears and opined that surgical correction of both shoulders was appropriate.
6. On January 19, 2006, plaintiff was referred by defendant for evaluation with Dr. James Thompson. Dr. Thompson agreed with the assessment of recurrent bilateral rotator cuff tears and recommended surgical correction. Thereafter, plaintiff underwent left shoulder surgery on February 20, 2006, performed by Dr. Thompson. Plaintiff remained out of work and was paid indemnity benefits through March 9, 2006. *Page 5 
7. On July 18, 2006, plaintiff presented to Dr. Elder with a six week history of left hip pain. Plaintiff did not recall an inciting event or trauma; however, plaintiff had received bilateral hip replacements in 1999, performed by Dr. Elder's partner, Dr. John Spencer. On September 12, 2006, plaintiff informed Dr. Elder he had been having a six-to-eight month history of bilateral groin pain.
8. On October 2, 2006, Dr. Thompson performed a right shoulder surgical repair. Following the surgery, plaintiff was given work limitations of no work with his right arm. Plaintiff returned to work with restrictions on October 19, 2006, and continued working with restrictions until February 19, 2007. On August 7, 2007, Dr. Thompson released plaintiff to return to full duty without restrictions regarding his shoulder injuries, and on October 2, 2007, assigned a 20% permanent partial disability rating to each shoulder.
9. Due to plaintiff's continuing complaints of hip pain, Dr. Elder referred plaintiff to his partner, Dr. Joseph Dement, who was more experienced with hip replacement issues. Dr. Dement evaluated plaintiff on November 20, 2006, at which time he reviewed recent x-rays and compared them to x-rays from the original hip replacement. Dr. Dement noted "significant appearance change in asymmetry of the femoral heads." Dr. Dement recommended a left hip replacement.
10. On March 6, 2007, Dr. Dement performed the left hip replacement surgery. In his pre-op history he reported "a dramatic change in position of the prosthesis." Due to some post-surgical complications, plaintiff required a subsequent left hip revision surgery on October 10, 2007. Plaintiff continued to have residual symptoms and pain which required a third left hip surgery on September 16, 2008. Dr. Dement opined that plaintiff would not have been released to return to work following the 2008 surgery until December 16, 2008. *Page 6 
11. Dr. Dement noted that plaintiff had undergone the bilateral hip replacements in 1999, then suffered some post-surgical complications in the form of two hip dislocations within a few months following surgery. Dr. Dement further noted that the hip replacements in 1999 appeared to be less than ideally positioned which accounted for his early hip dislocations. However, Dr. Dement opined that the hips thereafter became "cemented" to the prosthetic hip joint by fibrous scar tissue formed over time which adhered to the prosthetic and held the joint in place. While this manner of securing the prosthetic is not the optimum (actual bone growth adhering the prosthetic to the hip is preferred), the fibrous scar tissue formed a bond sufficient to permit plaintiff to function normally from 1999 until 2006.
12. Dr. Dement noted that individuals who have undergone hip replacement are advised to avoid activities that involve "impact loading" such as jogging, jumping sports, skiing mogul, or other activities that would cause a rapid loading to the hip joint, as such impacts can cause deformity to the plastic in the prosthetic joint. Dr. Dement opined that while a normally ingrown prosthesis cannot be disrupted by a fall or impact, a prosthetic joint joined by fibrous scar tissue such as plaintiff's, is subject to loosening of the fixation from a trauma or impact load.
13. As noted above, Dr. Dement had established a shift in plaintiff's prosthetic after the 2004 fall by comparing x-rays taken at the time of the initial hip replacement to x-rays taken after the work-related incident. Dr. Dement opined that the significant shifting of plaintiff's left hip prosthesis which necessitated surgery would not have occurred unless there was some kind of trauma to the hip that would result in the fibrous scarring loosening and allowing the prosthetic to shift. Dr. Dement further opined that plaintiff's slip and fall in which he landed with his full weight on his shoulder and then his hip in a high impact incident, contributed to the necessity for *Page 7 
the hip surgeries by at least 50%. The remaining 50% was due to normal wear and tear on the prosthetic.
14. The Full Commission finds that plaintiff's inability to fully describe the mechanism of the fall due to his unconsciousness is not fatal to his claim. There is no question that plaintiff landed with full impact on his left shoulder. Noting plaintiff's high weight, Dr. Thompson described the fall as happening with "great force" and constituting a "high energy trauma." It is unreasonable to presume that plaintiff hit the floor with his shoulder and then argue that his hip did not follow. Accordingly, the Full Commission finds sufficient evidence to show that plaintiff's hip also hit the floor and suffered an impact injury as a result of plaintiff's work-related slip and fall.
15. The Full Commission further finds it is not fatal that plaintiff failed to immediately express injury to the hip during his treatment. The expert medical testimony of Dr. Dement makes clear that plaintiff would not experience immediate hip pain following the incident, but that the resulting shift in the prosthetic would cause an increasing wear on the prosthetic that would eventually result in an increase in pain and the necessity for the hip replacement surgery.
16. The Full Commission finds as fact by the preponderance of the expert medical testimony that as a result of the impact of the work-related fall of May 22, 2004, plaintiff's hip prosthetic shifted. Further, the shift caused a misalignment of the prosthetic which resulted in wearing that necessitated surgical replacement.
17. On June 4, 2008, plaintiff underwent an Independent Medical Evaluation of his shoulders with Dr. Charles DePaolo. Dr. DePaolo noted migration of plaintiff's humeral head and noted worsening sharp pain in his left shoulder. Dr. DePaolo opined that plaintiff retained a 20% impairment to his right shoulder and a 35% impairment to his left shoulder. Plaintiff subsequently *Page 8 
returned to Dr. DePaolo on September 8, 2008. Dr. DePaolo noted that plaintiff had radiating pain into his right and left hand, and diagnosed plaintiff with a complete rupture of the left rotator cuff but did not recommend any further surgery.
18. Dr. DePaolo opined that due to his surgeries and rotator cuff problems, plaintiff would not be able to return to his regular work duties as a meat cutter at Ingles. While he opined that a Functional Capacity Evaluation would be appropriate to determine plaintiff's full safe work capacity, Dr. DePaolo further opined that plaintiff would not be able to lift any significant weight away from his body and would be restricted from overhead work. For these reasons, he recommended plaintiff be restricted to sedentary work capacity.
19. Plaintiff returned to Dr. Thompson on February 7, 2009, at which time Dr. Thompson did not recommend any further surgical intervention and referred plaintiff for pain management evaluation to further manage his ongoing pain.
20. On or about March 27, 2008, plaintiff was paid an advance of $3,507.84 against the permanent impairment ratings due as a result of his bilateral shoulder injury.
21. Following his separation from employment with defendant in 2007, plaintiff obtained a license to sell insurance as a more sedentary position. Since that time, plaintiff has attempted to work as much as he is able and has been associated with two insurance agencies. He has earned less than $500 in total compensation. Opinion testimony was received from an insurance agency owner that plaintiff's inability to profit from insurance sales was primarily due to a weak economy and the fact that it takes several years to generate significant sales.
22. Plaintiff's average weekly wage was $548.07, yielding a compensation rate of $365.40 per week.
 *********** *Page 9 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of the employment on May 22, 2004, resulting in injuries to his bilateral shoulders. Regarding plaintiff's left hip injury, the Full Commission concludes as a matter of law that the injury resulted from the slip and fall of May 22, 2004, arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. Defendant has accepted plaintiff's claim for injuries to his shoulders and plaintiff has received and/or is receiving the compensation to which he is entitled under the Act for those injuries. N.C. Gen. Stat. § 97-29.
3. As a result of the compensable injury to his left hip, plaintiff was temporarily totally disabled from employment from March 6, 2006, the date of the initial hip surgery, until December 16, 2008, when Dr. Dement opined that plaintiff could return to work. Therefore, plaintiff is entitled to temporary total disability compensation at the rate of $365.40 per week for the period from March 6, 2006, through December 16, 2008, less those periods during which plaintiff was attempting to return to work for defendant at light duty. N.C. Gen. Stat. § 97-29.
4. The greater weight of the expert medical testimony shows that plaintiff's left hip surgeries were 50% related to his injury and 50% related to normal wear and tear of his prosthesis. Therefore, defendant is responsible to pay for its proportionate share of such surgical cost and medical treatment. N.C. Gen. Stat. § 97-25.
5. Plaintiff retains a 20% permanent impairment to his right shoulder and a 20% impairment rating to his left shoulder as a result of his compensable injuries. Accordingly, *Page 10 
plaintiff is entitled to 48 weeks of compensation for the right arm and 48 weeks for the left arm, to be paid at the weekly amount of $365.40, less the advance payment of $3,507.84 already tendered by defendant. N.C. Gen. Stat. § 97-31(13).
6. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, including but not limited to Dr. Thompson's recommendation for pain management with Dr. Lewis, subject to the statute of limitations prescribed in N.C. Gen. Stat. § 97-25.1. N.C. Gen. Stat. § 97-2(19).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendant shall pay temporary total disability compensation to plaintiff at the rate of $365.40 per week for the period from March 6, 2006, until December 16, 2008, less those periods of time in which plaintiff worked at light duty. As said compensation has accrued, it shall be paid in a lump sum.
2. Subject to a reasonable attorney's fee herein approved, defendant shall pay permanent partial disability compensation at the rate of $365.40 per week for 96 weeks, less the advance payment of $3,507.84 already tendered by defendant.
3. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraphs 1 and 2 above is hereby approved to be deducted from sums due plaintiff and paid directly to counsel. *Page 11 
4. Defendant shall pay medical expenses incurred or to be incurred, including payment of pain management with Dr. Lewis as recommended by Dr. Thompson, when medical bills have been submitted according to established Industrial Commission procedures.
5. As plaintiff has not reached maximum medical improvement or received a rating for the left hip surgeries, this Opinion does not address this issue. However, in the event that the parties should be unable to agree on the amount of permanent partial disability compensation which may be due plaintiff, either party may request a hearing from the Commission to resolve this matter.
6. Defendant shall pay the costs.
This the 14th day of November, 2011.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1